WESTERN UNION TELEGRAPH COMPANY V. J. WEITING.

(No. 1073, Op. Book No. 2, p. 467.)

ERROR from Galveston County. Opinion by WHITE, P. J.

§ 801. *Telegraph companies; their liability; cipher dispatch; limitation of liability by contract; measure of damage in action against; venue of suit against; plea in abatement as to venue.* Weiting, a cotton buyer for himself and others, at Galveston, Texas, had chartered the schooner Robinson, with a carrying capacity for one thousand three hundred and ten bales, for the purpose of loading her with the cotton bought by him. By the charter-party he had till the 3d day of January to load his vessel. Amongst others for whom he had purchased cotton was one Remington, a manufacturer, of Falls River, Mass. About the 25th day of December, Weiting apprised Remington that he lacked three hundred bales of having a full ship load of cotton, and wished to know if Remington desired to purchase more cotton. On the 26th day of December, Remington sent him a night dispatch, by the Western Union Telegraph Company, in the following words and figures, to wit: "Falls River, December 26, 1876. To J. Weiting, Galveston: Ab Durfee, Buccanier, Poacher, Plurality, Plunket, Finney, Absorb; get good selection, for party is large buyer." The translation of this dispatch was: "Falls River, December 26, 1876. To J. Weiting, Galveston: Buy for account of Durfee Mills one hundred bales each of ordinary, strict ordinary, and good ordinary cotton, price ten cents; be careful; get good selection, for party is large buyer." This dispatch came through, having been correctly transmitted, and reached the Galveston office of the telegraph company in time to have been delivered on the morning of the 27th, and, had it been so delivered, the order contained in it for the cotton could have been filled by Weiting according to its terms. It was not delivered, but

444

laid in the office of the company in Galveston until the 28th, when, Remington having again dispatched Weiting, the latter went to the office to make inquiries, and was told no dispatch had been received. Subsequently, on the 28th, Remington repeated the original dispatch, and, when it was delivered, the original dispatch of the 26th was also found in the office by the operator, and delivered, the operator then admitting that the same was received at the office in due course, and had been mislaid, in consequence of which it had not been delivered. When the dispatch came to hand, on the 28th, cotton had advanced, and the order could not be filled by Weiting. Having no other orders, and being unable to fill the vessel himself, Weiting sold the freight room for the three hundred bales to other parties, failed to get the cotton on board until two days after "the lay days" of the vessel had expired, in consequence of which Weiting had to pay in cash $100 as demurrage. The loss he sustained on the price he paid, and that for which he sold the freight room in the vessel, was $93.75, and he also paid primage, $4.69. On the 16th of December, 1878, he brought suit in justice's court, precinct No. 3, Galveston county, against the telegraph company, upon an account for damages, setting out as actual damages the items as above stated. Defendant, the company, presented the following plea to the jurisdiction of the court, viz.: "Now comes the defendant, by its agent, David Hall, and says that the principal office of defendant's company is located in the second precinct of Galveston county, and not in the precinct in which this suit has been brought; wherefore it submits that this court has no jurisdiction to try this case. Affiant states that the facts herein stated are within his knowledge, and avers that they are true;" and this plea was signed and sworn to.

On the trial in the justice's court judgment was rendered for the plaintiff for the sum of $193.75 and costs. Defendant appealed to the county court. In the county court defendant insisted on its plea to the jurisdiction,

and denied that plaintiff had been damaged by reason of negligence of defendant in any sum whatever, but that if any damage was sustained by the plaintiff such damage did not exceed the amount paid for the transmission of plaintiff's dispatch. A jury was waived and the cause submitted to the county judge, who overruled the plea to the jurisdiction, and upon the merits gave judgment for the plaintiff against defendant and sureties on the appeal bond for $214.10. The case is brought here by writ of error. It is claimed that the court erred in overruling the plea to the jurisdiction, and in support of this proposition we are cited to a provision of section 8 of an act to provide for the election of justices of the peace, and to define their powers and jurisdiction [Gen. Laws 15th Leg. chap. 103, p. 157], as follows: "A suit against a private corporation, created by or under the laws of any other state or county, must be commenced in a precinct in which there is property of such corporation, or in which there is any agency thereof, or in which the cause of action or a part thereof arose." [NOTE.— For the statute as it now is, see R. S. 1556, subd. 10.] It will be noticed that the only grounds stated in the plea are "that the principal office of defendant's company is located in the second precinct of Galveston county, and not in the precinct in which the suit has been brought." This allegation might be true, and yet the suit have properly been brought in precinct No. 3, because, notwithstanding the principal office might have been in precinct No. 2, the corporation might also have owned property in or had another agency in precinct No. 3, and if so, then, under the statute, the jurisdiction properly attached in the latter precinct. The plea was wholly defective in failing to negative the fact by direct allegation that the corporation either owned property or had an agency in the precinct where the suit was brought. We come now to the most important questions involved in the case. They are thus presented in the able brief of appellant's counsel: "The court erred in rendering judgment for

the plaintiff in any sum in excess of the price paid for the transmission of the telegraph message, the message being in cipher and not conveying by its terms or wording information as to its importance to the defendant company and its agents. The message should have shown by its language that it related to an important business transaction, and that valuable rights might be prejudiced by any delay in the transmission and delivery of the message, to have entitled the plaintiff to recover other than mere nominal damages; that is, the cost of the telegram for failure to deliver. In this case neither the nature or the extent of the loss which might result from a breach of the contract or from negligence in the delivery of the dispatch were foreshadowed or disclosed either by the text of the message or by information apart from the message."

It is also contended by appellant that the contract between Remington, the agent of Weiting, and the telegraph company, in regard to sending the dispatch, expressly released the company from any damages, except such as are mentioned in said contract. This contract was printed upon the blank on which the dispatch was written before its transmission, and is in the following words: "The Western Union Telegraph Company. Half-rate message. The business of telegraphing is liable to errors and delays arising from causes which cannot at all times be guarded against, including sometimes negligence of servants and agents, whom it is necessary to employ. Most errors and delays may be prevented by repetition, for which, during the day, half price extra is charged in addition to the full tariff rates. The Western Union Telegraph Company will receive messages for transmission between stations in the United States east of the Mississippi river, to be sent without repetition during the night, at one-half the usual rates, on condition that the sender will agree that he will not claim damages from it for errors or delays, or for non-delivery of such message, happening from any cause other than the acts

of its corporate officers, beyond a sum equal to ten times the amount paid for transmission, and that no claim for damages shall be valid unless presented in writing within twenty days from sending the message. The company will be responsible to the limit of its line only for messages destined beyond, but will act as the sender's agent to deliver the message to connecting companies or carriers without charge and without liability. William Orton, president; Geo. H. Mumford, secretary. Send the following half-rate message, subject to the above terms, which are agreed to;" and here follows the dispatch from Remington to Weiting. In this case we are relieved from the necessity of deciding a question which has been a fruitful source of conflict in the decisions of the courts in telegraph cases. Here the case is entirely free from any question of transmission. The dispatch, though in cipher, was not only sent by the company, but it was sent correctly as written by the sender. Not only so, but it was received at the terminal office of its destination by the company without delay, and was taken from the wires there in the very language in which it was written by Remington. All that remained to be done as a full and complete compliance by the company with its contract was simply to deliver the message as soon as practicable to the party to whom it was directed. The simple questions are: Were they bound to do so, and liable for damage in case of failure to do so? Could ignorance of the contents and importance of the message after its receipt excuse them? If not, and damages were occasioned, what is the proper measure of damage to the party injured?

In most of the cases, with regard to the right to recover damages of telegraph companies for supposed breaches of contract, the courts have held that the proper rule for measuring the liability for damages was that as enunciated in Hadley v. Baxendale, 9 Exchequer R. 341. The rule is thus stated by Alderson, B., delivering the opinion of the court: "Now we think the proper rule in such a

case as the present is this: Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may be fairly and reasonably considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as to the probable result of the breach of it. Now if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus were known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if the special circumstances were wholly unknown to the party breaking the contract, he at the most could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances. For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case, and of this advantage it would be very unjust to deprive them. Now the above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract." In the case of Gee v. Lancashire & Yorkshire Railway Co., 6 H. & N. 211, it was ruled on the trial as *matter of law* that the plaintiffs were entitled to recover for loss of profits and wages; but the court of review held that this was a question which should have been left to the jury to determine, whether the stoppage of the mill was the natural consequence of the non-delivery of the cotton. Baron Wilde, in that case, thus speaks of the ruling in Hadley v. Baxendale: "For my own

part, I think, although an excellent attempt was made in Hadley v. Baxendale to lay down a rule on the subject, it will be found that the rule is not capable of meeting all cases, and when the matter comes to be further considered, it will probably turn out that there is no such thing as a rule as to the legal measure of damages, applicable to all cases."

Applying the rule of Hadley v. Baxendale to telegraph cases, some of the courts, it seems to us, have gone to great lengths in determining what "must be in the contemplation of both parties," at the time the contract is entered into, in order to hold the company liable for damages. Under most of the authorities, where the dispatch is in cipher, and its nature, character and importance are not disclosed and fully explained, it has been held that for any error in transmission the company would only be liable for the actual price of the dispatch paid by the sender. These cases may all be found in Allen's Telegraph Cases, and most of them are cited in appellant's brief. In Scott & Jarnigan's Law of Telegraphs, it is said: "The true rule being, then, that the damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is, such as might be naturally expected to follow its violation, it would seem that its proper application to telegraph cases would be this: that although the message were unintelligible to the company, yet, as it had undertaken to transmit the message promptly and correctly, both parties contemplated that whatever loss should naturally, and in the usual course of things, follow a violation of this obligation, the company should be responsible for. It cannot be a matter of consequence for the operator to understand or appreciate the meaning of a dispatch, for he must send it in any event. It is to be presumed that the party receiving the message will understand it, if correctly transmitted; and thus to transmit is the special duty of the operator. If he fail to do this, and so disappoint, mislead or deceive the party ad-

dressed that damages are suffered, they will be measured by the extent of loss and injury naturally resulting from the error or failure to deliver the dispatch. The contract to safely, promptly and correctly transmit and deliver the message just as it is written out and delivered for transmission, exists just as much where the message is not understood by the company as where it is understood by them. And in case of failure so to transmit and deliver, the breach is as complete in the one case as in the other; and the company must be considered, we think, as holding itself responsible for all damages that may be the direct and natural result of such breach." [Scott & Jarnigan, §§ 406, 407, 408 and notes.] It has been said that the doctrine thus enunciated is without authority to support it. Whether this be so or not makes but little difference, if, amidst the great and irreconcilable conflict of opinion elsewhere expressed, it commends itself to our minds, as it does, for its fairness and reasonableness in contemplation of law and justice, equity and right.

Mr. Redfield, in his chapter upon telegraph companies, their rights, duties and responsibilities, says: "The rule of damages will be a plain one. The company must make good the loss resulting directly from any default on their part. We see no reason why the ordinary rule should not be applied to cases of this character, as that the party injured by a breach of contract is entitled to recover all his damages, including gains prevented as well as losses sustained, provided they are certain, and such as might naturally be expected to follow the breach. It is here said that it is only uncertain and contingent profits which the law excludes, and not such as, being the immediate and necessary result of the breach of the contract, may be fairly supposed to have entered into the contemplation of the parties when they made it, and are capable of being definitely ascertained by reference to established market rates. This same rule of damages has been applied in the state of New York to cases of failing to send messages by telegraph companies according to their duty

and undertaking. We do not apprehend that there is any valid objection to the application of this rule of damages to the case of telegraph companies on the ground of the secrecy and reserve with which such correspondence is commonly conducted, and that, consequently, the companies have not, in most cases, any sufficient data to form any just appreciation of the extent of the responsibility. The rule is not based so much upon what is supposed to have been the actual expectation of the parties as what it ought to have been under the circumstances, if their minds had been drawn to the contingency of a failure in performance. And if one or both the parties choose to enter into the contract in such ignorance of the facts as not to have been capable at the time of estimating the real extent of the responsibility assumed, that can be no sufficient ground to exonerate him from the full extent of responsibility attaching to the contract. The rule of responsibility is the same for all who freely enter into the same contract, whether fully or correctly informed of the extent of the obligation or not, provided they are not misled by the opposite party." [2 Redfield on Railroads (3d ed.), pp. 249, 250.] But it may be said that, by the contract, Remington, the agent of plaintiff, agreed that no damages for errors or delays, or for non-delivery of the message, happening from any cause other than the acts of its corporate officers, would be claimed beyond ten times the amount paid for transmission. If by "corporate officers" was intended to exclude servants, agents and employees, and limit the liability to such officers as might strictly and technically be called corporate, then the attempted exemption was contrary to public policy and void; and so, also, if the attempt was to limit liability from gross negligence on the part of any of its servants, agents or employees in the exercise of their employment. Such stipulations are neither reasonable nor valid. [Allen's Telegraph Cases, 530; 62 Ind. 1; 58 Ga. 433.] An unreasonable delay or total failure to deliver a telegraphic dispatch which has

been properly transmitted and correctly received can only be occasioned by gross negligence, and we might pile up case after case where courts have allowed damages against the company under such circumstances. In Allen's Cases we find the following: Park's case, 114; Bryant's case, 288; Squire's, 372; True's, 530. Other cases might be cited, such as 62 Ind. 1; 58 Ga. 433; 33 Wis. 558; 1 Col. T. 230. There being no doubt of the fact that the failure to deliver the message was an act of gross negligence, did the damages of which the plaintiff complains flow directly and naturally from this negligence? We are of opinion that they did. Plaintiff had telegraphed Remington, and had every reason to expect a reply, and one which would have enabled him to fill his vessel without any loss to himself whatsoever. The dispatch came; if it had been delivered, no loss would have occurred to plaintiff. It was not delivered to him, and because it was not, he was compelled to pay out of his own pockets the actual amount for which he sues, and for which judgment was rendered. These losses cannot be said to be remote, speculative or contingent. They never would have happened, in all human probability, but for defendant's gross negligence. We are of opinion that in reason, justice and law, the defendant in error was entitled to his judgment, and it is, therefore,

March 23, 1881.                              Affirmed.